**FILED**
JUL 10 2009
7-10-09
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AO 91 (REV.5/85) Criminal Complaint

AUSA Ryan S. Hedges (312) 353-5340

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE SCHENKIER

**UNDER SEAL**

UNITED STATES OF AMERICA

v.

ELGIN NATHAN JAMES

**CRIMINAL COMPLAINT**

CASE NUMBER:
**09CR596**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: Beginning in or about November 2005 and continuing until on or about February 25, 2006, at Mokena, in the Northern District of Illinois, Eastern Division, and elsewhere, ELGIN NATHAN JAMES, defendant herein:

> did attempt to commit extortion, which extortion would have obstructed, delayed, and affected commerce, as the terms "extortion" and "commerce" are defined in Title 18, United States Code, Section 1951(b), in that the defendant attempted to obtain property from another person, with that person's consent, induced by the wrongful use of actual and threatened force, violence, and fear;

in violation of Title 18, United States Code, Section 1951(a). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
CHRISTOPHER CROCKER
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 10, 2009          at Chicago, Illinois
Date                    City and State

SIDNEY I. SCHENKIER, U.S. Magistrate Judge
Name & Title of Judicial Officer          Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                ) ss
NORTHERN DISTRICT OF ILLINOIS   )

## AFFIDAVIT

I, CHRISTOPHER CROCKER, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for six years. I am currently assigned to FBI Chicago's South Resident Agency, Squad 1, and my duties include the investigation of various crimes, including narcotics organizations, gang organizations, bank robberies, kidnaping, extortion, and other violent crimes. Through my training and experience, I have become familiar with the methods used by criminals in conducting extortionate activities.

2. This affidavit is submitted in support of a criminal complaint alleging that ELGIN NATHAN JAMES ("JAMES") has violated Title 18, United States Code, Section 1951. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging JAMES with attempted extortion affecting interstate commerce, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal observations, knowledge, and information provided to me by other law enforcement agents and witnesses who have

1

personal knowledge of the events and circumstances described herein, as well as from a cooperating witness (the "Victim") who has proven reliable and has provided information which has been independently corroborated, as set forth in part herein.

4. My understanding and interpretation of conversations set forth in this affidavit are based on my knowledge of the investigation to date, information provided by the Victim, consensually recorded telephone calls and voice mail messages, consensual audio recordings of in-person meetings made in this investigation, the context of the conversations, law enforcement surveillance, my training and experience, and conversations I have had with other agents and officers experienced in violent crime investigations. The quotations contained herein are from preliminary transcripts of the recorded conversations, which are subject to revision.

## BACKGROUND

5. ELGIN NATHAN JAMES is a self-proclaimed founding member of a nationally organized street gang called "FSU" which stands for "Fuck Shit Up" and "Friends Stand United." According to JAMES' statements in magazine and television interviews, which I have reviewed, JAMES and others formed FSU in the late 1990s in Boston, Massachusetts, purportedly to establish control over Boston's hardcore punk rock music scene and to drive "Nazi skinheads" out of the clubs and venues that hosted hardcore concerts. JAMES and other FSU members boast in these popular media accounts, and in a

self-produced video, that one of FSU's tenets is to outnumber any individual with whom FSU has a conflict and to inflict grave bodily harm upon such individual in a mass beating.

6. Certain FSU gang beatings are depicted in a self-produced, documentary-style video from 2004 featuring JAMES and other FSU members entitled "Boston Beatdown II," a copy of which I have reviewed. Throughout this video, which remains commercially available today, JAMES and other FSU members describe the circumstances surrounding FSU's formation and existence, and boast about the gang's beatings and the violent methods used to carry them out. In the video, FSU members are shown repeatedly beating individuals at hardcore punk rock concerts and on the streets of Boston. One of the victims of an FSU street beating depicted in the video is a well-known recording artist, a beating described in the video as "funny as hell." In addition, the video shows JAMES stitching up a wound on his own face, and sewing closed a laceration of approximately 8 to 10 inches in length on the torso of another FSU member. JAMES refers to himself in the video as an "underground surgeon" who performs medical procedures on individuals when circumstances are "not conducive" for the individual to go to a hospital or to law enforcement authorities because the individual has inflicted more severe injuries on somebody else.

7. FSU was featured in The History Channel's "Gangland" series in an episode entitled "Rage Against Society" that aired in or about the end of October 2008. I have also reviewed a copy of this program. The episode contains interviews of JAMES and

other FSU members, who describe the formation of FSU in Boston and the development of FSU into a national street gang during the 2004-2006 time period with chapters being established in Boston, Chicago, Upstate New York (Troy), Philadelphia / South New Jersey, southern California, and Seattle, among other locations. In the episode, JAMES speaks extensively about the methods, tactics, and ideals that established FSU's reputation for violence. The "Gangland" episode includes footage of many of the FSU gang beatings contained in "Boston Beatdown II." The episode also details a brutal February 2005 FSU beating of an individual at a hardcore punk rock show in Troy, New York, which resulted in that individual's death. According to news reports, several FSU members were charged with gang assault and homicide in connection with this February 2005 killing.

8. The Victim is a popular recording artist from the Chicago area. The Victim is not and has never been a member of FSU. During the relevant time period, beginning in or about November 2005 and continuing until on or about February 25, 2006, the Victim was employed as a musician in a popular rock group (the "Victim's Band") that was actively touring and performing at venues in various cities in the United States and other countries. The Victim has no criminal convictions.

**PROBABLE CAUSE**

9. In or about July and August 2005, the Victim's Band was taking part in an alternative music and extreme sports festival that tours North America in the spring and summer months (the "Tour"). At that time, the Victim was friends with some of the

members of another nationally known popular rock group from the Chicago area taking part in the Tour ("Rock Band A"). According to the Victim, during a visit to Rock Band A's tour bus one night after a performance on the Tour, the Victim had a disagreement with an employee of Rock Band A. The Victim advised that the Victim later learned that this employee of Rock Band A was associated with the head security guard for Rock Band A, an FSU member based in Chicago.

10. The Victim said that, toward the end of the Tour, the Victim learned there was a group of guys who wanted to harm him. According to the Victim, on the last night of the Tour, approximately August 14, 2005, the Victim was heckled by a group of people who called the Victim names. Thereafter, the Victim advised, the Victim started to hear and learn more about FSU, and some friends and acquaintances of the Victim warned the Victim to stay away from FSU.

11. On or about October 7, 2005, the Victim's Band was in the Boston area to perform a concert scheduled as part of the Band's month-long tour performing in various cities across the United States. According to the Victim, as the Victim walked to the Band's tour bus before the show, the Victim observed a security guard talking on his cell phone and looking at the Victim. Before the Victim could enter the tour bus, six unknown males approached the Victim, pushed the Victim to the ground, and repeatedly kicked and punched the Victim. From the ground, the Victim observed the security guard simply watching as the six males punched and kicked the Victim. Another member of the Victim's

Band and an employee of another band performing that night came to the Victim's aid and, together, they were able to fend off some of the attackers and allow the Victim to get into the tour bus. The Victim sustained bruises and contusions in the attack and, according to the Victim, at least one of the individuals who came to the Victim's aid sustained serious facial injuries. According to the Victim, the Victim's Band did not perform that night, fearing further violent attacks.

        12. In or about late October or early November 2005, JAMES called the Victim on the Victim's cellular phone while the Victim was in Mokena, Illinois. The Victim recorded a portion of this phone call and later provided the recording to me. According to the Victim, JAMES first identified himself and told the Victim that JAMES could resolve the Victim's dispute with FSU if the Victim made a payment to JAMES; otherwise, FSU members would continue to attack the Victim as the Victim traveled throughout the United States. During the recorded portion of the phone call, JAMES referenced the Tour and the Victim's issue with "us" and stated to the Victim:

> We keep our shit locked down [referring to FSU], that's why we're you know in, uh, fifteen cities . . . right now. Unfortunately, all big markets for people to go through . . . unfortunately [you] have to deal with this situation and this is where we're at, ya know? And it's the kind of thing where you can keep payin' ya know?

JAMES said the Victim could show that the Victim was "committed to doing the right thing and that [the Victim was] committed to being on the right team" by making a $5,000 "donation" to FSU, through JAMES, to be used as bail for one of JAMES' "best dudes, one

of my fuckin' sergeants" who was "bein' held on a homicide," and to buy Christmas gifts for this individual's three children. JAMES said if the Victim paid JAMES the demanded $5,000, the Victim's dispute with FSU would be "squashed" and the Victim "could travel free across the country." The Victim agreed to think about JAMES' proposal and to call JAMES the following Monday at a phone number that JAMES provided.

13.　　　　The Victim did not call JAMES the following Monday. Approximately two days later, JAMES called the Victim and left a voice mail; the Victim later provided a recording of this voice mail to me. In this voice mail, JAMES stated, in part, "[Are] you my fucking girlfriend now? Gotta hunt you down? . . . I'm surprised you didn't call as we agreed." The Victim did not return JAMES' call.

14.　　　　Throughout the month of November 2005, the Victim researched JAMES and FSU on the internet. The Victim located information posted to the internet by FSU members and watched video clips from "Boston Beatdown II" featuring JAMES, all of which confirmed JAMES' statements to the Victim, in the phone call referenced in Paragraph 12 above, regarding FSU's presence in numerous cities, its propensity for violence, and JAMES' status as a national leader of FSU.

15.　　　　In or about the evening of November 27, 2005, the Victim was visiting Friend A in Orlando, Florida. According to the Victim and others, the Victim was at an Orlando bar that evening with Friend A and several friends of Friend A, including Friend B and his roommate and brother. According to the Victim, Friend A, and Friend B,

when the group left the bar for the evening and walked toward their vehicles, they passed a group of men on the street. The Victim observed some of the men wearing clothing with logos that said "FSU" and "FSU Nation." According to the Victim and Friend B, one person in the group appeared to recognize the Victim and shouted words to the effect of "It looks like that dude from [the Victim's Band]"; another individual yelled, "It's him!"; and the group of males then rushed toward the Victim. The Victim escaped from the location with Friend A in Friend A's car. According to Witness A, Friend B and his brother were severely beaten by a group of males, at least one of whom was wearing a t-shirt bearing an "FSU" logo. Friend B advised me that he was kicked and punched in the ribs and face until he was unconscious. According to Friend B, he sustained severe injuries from the beating, including a broken nose that required stitches and corrective surgery.

16.     Approximately one hour later the Victim received a telephone call from JAMES, which was not recorded. According to the Victim, JAMES asked how the Victim's trip to Florida was going. The Victim had not told JAMES in any previous conversation that the Victim would be traveling to Florida. According to the Victim, after the Victim told JAMES that the Victim would not pay the $5,000 because it was not right to intimidate the Victim and force the Victim to pay, JAMES ended the call by stating in a sarcastic tone, "O.K. Good luck with everything. See you around." The Victim understood JAMES' sarcastic words and tone to mean that this type of attack would be repeated against the Victim everywhere the Victim traveled. Although this telephone call was not recorded,

the Victim's cell phone records reflect a call received from a blocked telephone number at 4:27 a.m. on November 28, 2005.

17. The Victim's internet research on FSU and the circumstances of the Orlando attack, including JAMES' phone call to the Victim shortly after the attack, caused the Victim to fear for the Victim's personal safety and the safety of the Victim's friends. Accordingly, in or about early December 2005, the Victim contacted the FBI's Chicago Field Office. The Victim agreed to cooperate with the FBI and to record phone calls between JAMES and the Victim.

18. On or about December 20, 2005, the Victim made a recorded phone call to JAMES. In this call, the Victim agreed to pay JAMES the demanded $5,000 and stated that the Victim was making the payment so that the Victim and the Victim's Band would not have to worry about being harmed by FSU during the band's upcoming tour across the United States. JAMES responded that he understood the Victim was worried about safety, but JAMES suggested that the Victim's safety and the Victim's "donation" should not be viewed as being related. Nevertheless, JAMES told the Victim that after the Victim made the $5,000 payment:

> I will definitely go out there [to FSU] as a friend . . . sayin' you and I have set up this friendship now, I will go out there and make sure because I can do things with that and nothing would happen to you. You know, just because you and I are friends.

In this recorded phone call, JAMES also told the Victim that JAMES was "really not a fan" of discussing this arrangement with the Victim "over the telephone."

9

19. In the first week of January 2006, the Victim's Band toured Japan. Upon the Victim's return to the Chicago area, the Victim and JAMES exchanged voice mails and had a series of recorded conversations over the next several weeks about how best to facilitate the Victim's $5,000 payment to JAMES. In phone calls recorded on or about January 27 and January 30, 2006, JAMES and the Victim discussed the possibility of the Victim making the payment to JAMES via an internet PayPal account, and the Victim told JAMES that the Victim would attempt to establish such an account.

20. In a phone call recorded on or about January 30, 2006, just before the Victim's Band was to embark on a U.S. tour, the Victim asked JAMES to spread the word to FSU that the Victim was in the process of making amends and that the Victim and the Victim's Band therefore should not be attacked by FSU. JAMES told the Victim to "consider that done" and said that JAMES knew the Victim's Band would be playing in "like twelve or fifteen cities or something where we [FSU] are so I just make sure everyone knows." JAMES further stated that after the Victim made the $5,000 payment, "it's gonna be fuckin' clean slate totally . . . like none of this shit ever happened."

21. On or about February 6, 2006, JAMES left the following voice mail for the Victim:

> Yo! What's up? It's Nathan callin' . . . uh, let's work this shit out man. Fucking takin' an extraordinarily long time . . . . I worked out to do something positive, make this positive for everyone [and] do a favor for you. Cause we've got a situation in your control, but . . . don't misinterpret patience and understanding for weakness, know what I'm saying? . . . Getting pretty fuckin' silly. So, uh . . . I'll talk to ya, gimme a call back, work this shit out.

The Victim interpreted this message as an expression of JAMES' irritation that the Victim had not yet paid the $5,000 to JAMES and an implicit threat by JAMES that FSU would cause further harm to the Victim if the payment was not forthcoming.

22.    In a phone call recorded on or about February 6, 2006, the Victim explained to JAMES that the Victim was having difficulty setting up a PayPal account and the Victim proposed sending the $5,000 payment to JAMES via Western Union. The Victim advised JAMES that the Victim had "cash out on the road from, like merch [merchandise sales]" and that the Victim could have the Victim's tour manager or accountant access those funds and wire the payment. JAMES agreed that the Victim could wire the payment via Western Union. The Victim then asked JAMES if JAMES had been able to "clear anything" at a meeting with his "boys" (meaning FSU) on the east coast because the Victim's Band was scheduled to play concerts in New Jersey and Philadelphia in the coming days. JAMES stated that he had attended the "east coast meeting" and that he had been clearing the Victim's name on a "show by show, city by city basis" and that everything would be "all set" in "Jersey tomorrow."

23.    In a phone call recorded on or about February 13, 2006, the Victim asked for JAMES' assurance that the Victim's Band would be safe during an upcoming show in Arizona while JAMES and the Victim were working out the payment logistics. JAMES said Arizona "should be good. Arizona will be fine." The Victim then stated that the Victim wanted to settle the issue with JAMES and FSU in order to keep the Victim and the Victim's

acquaintances and family safe. JAMES responded that the Victim's motivation for the "charitable" contribution did not matter. But JAMES further stated that after the Victim made the payment, JAMES would make it known to FSU "hey, you know, I know there [were] some situations before that, but this is the deal, this is the kinda person this person is, this is what he did for, you know . . . for the charities . . . and then . . . everyone will know . . . [what] you've done as a charitable thing [for FSU causes]." JAMES told the Victim that JAMES was explaining their arrangement "about as clear as I can say it on the phone." The Victim expressed hope that the arrangement with JAMES would keep the Victim safe the next time the Victim traveled to Florida. JAMES acknowledged the Victim's previous problems in Florida and stated:

> You know how things are, things travel like wildfire and, you know, the word, if the word is bad, if something's negative or this person is not a friend then that spreads like wildfire . . . just as quick if not quicker.

24.     Later on February 13, 2006, JAMES left the Victim a voice mail that instructed the Victim to send the Western Union payment to a certain location in the name of a third party. In a phone call recorded later that day, the Victim told JAMES that the Victim wanted to send the money directly to JAMES because JAMES was the one clearing the Victim's name with FSU and the Victim did not want to take the chance of JAMES not receiving the payment. JAMES responded:

> No, no, I totally understand, I think it's kinda like, ya know, both of us have been feeling each other out through this whole thing I just wanna make sure, . . . all the sudden I'm not gonna show up there [at Western Union], people are gonna be like, . . . it's just some sort of blackmail, cause as far as I'm

12

> concerned it's exactly not . . . To be honest with you, I'm going against, you know, the world of a thousand with my own will. My will just happens to be stronger, ya know what I mean? And there are people [in FSU] that are upset and hurt by this because, because of the situation on paper should be like, oh . . . somethin' crazy should be done [to the Victim], but like I said . . . we've talked, you've explained it, . . . it's just some stupid thing that never should have happened in the first place.

The Victim understood JAMES' comments to mean, while there were many FSU members who wanted to inflict serious physical harm upon the Victim, JAMES had sufficient control over the group to prevent any further attacks upon the Victim and would exercise that control only if the Victim made the $5,000 payment to JAMES.

25.     In this same recorded phone call, the Victim also proposed paying JAMES in person later in the month when the Victim's Band was scheduled to be in southern California to perform a concert. In previous conversations, JAMES had informed the Victim that JAMES resided in the Los Angeles area. On or about February 14, 2006, JAMES left a voice mail for the Victim in which JAMES agreed to meet the Victim in person outside the concert venue where the Victim's Band was scheduled to perform on February 25, 2006 (the "Southern California Club").

26.     A few days before the scheduled meeting between the Victim and JAMES, on or about February 21, 2006, the Victim's Band played a concert at a club in Salt Lake City, Utah. According to the Victim, four males wearing masks rushed the Victim as he was leaving the club after the performance. The Victim was hit on the head at least once before the club's security staff chased away the assailants. According to the Victim, one of

the club's promoters told the Victim that the club had prior problems with one of the men who attacked the Victim, and that the attacker had moved to Salt Lake City from Orange County, California, and was known to be a member of FSU.

27.     Later that evening, the Victim made a recorded phone call to JAMES and accused JAMES of not living up to their agreement because the Victim had been jumped by FSU in Salt Lake City. JAMES responded, "Well that dude [I] promise you, that . . . has nothin' to do with us. We don't got nobody in Salt Lake City." JAMES then told the Victim that he was going to call the Victim right back from a different number and that the Victim should answer the call. JAMES then called the Victim back from a blocked phone number, and told the Victim in a recorded phone call:

> . . . [W]e don't have anyone in Salt Lake City, you know what I mean, I don't know if it's sort of a copycat thing . . . I'll make a couple of phone calls. Our deal's still on . . . . I don't know how this happened this was some sort of miscommunication, ya know what I mean . . . [but] we have not settled our shit yet as we know! We've made an agreement that we're going to, a gentlemen's agreement, and we both held up to it. . . . Because of this . . . everywhere you've gone we have people . . . they have been told, like the day beforehand everything's cool . . . once we got our shit done . . . and this shit is covered, everyone knows that . . . you and I are together, that you're with me, no one anywhere is ever gonna fuck with you!

JAMES then promised to follow through on the arrangement if the Victim paid JAMES at their meeting as planned: ". . . our shit is good on Saturday [February 25] . . . all this shit we leave behind us . . . if we have copycat kids I don't know [or] we have some renegade dude out there . . . well then that falls on me and I'll clean up this mess."

14

28.     JAMES and the Victim traded a series of voice mails over the next few days, and ultimately agreed to meet at approximately 3:00 p.m. on February 25, 2006, outside the Southern California Club where the Victim's Band was scheduled to perform.

29.     At approximately 3:45 p.m. on February 25, 2006, under FBI surveillance, the Victim met JAMES outside of the Southern California Club. The Victim handed JAMES an envelope containing $5,000 in United States currency, which funds the FBI had provided to the Victim. In this recorded face-to-face meeting, the Victim asked JAMES if everything was "cool" and JAMES replied, ". . . all's good, man." The Victim understood JAMES to mean that JAMES would, in exchange for this $5,000 payment, take all necessary steps to ensure that FSU members would not attack the Victim and the Victim's friends in the future.

30.     According to the Victim, since the Victim paid JAMES $5,000 on February 25, 2006, neither the Victim nor any of the Victim's friends have had any encounter with FSU members or any further contact with JAMES.

## CONCLUSION

31.     Based on the foregoing, I submit that there is probable cause to believe that ELGIN NATHAN JAMES violated Title 18, United States Code, Section 1951, in that JAMES did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, namely $5,000, from the

Victim, with the Victim's consent, induced by the wrongful use of actual and threatened force, violence, and fear.

FURTHER AFFIANT SAYETH NOT.

_____
CHRISTOPHER CROCKER
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on July 10, 2009.

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge